**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL ACTION** |
| | : | **NO.  06-650-01** |
| **JAMES H. DENNIS, JR.** | : | |
| **a/k/a "JAMES SNOW"** | : | |
| | : | |

## ORDER AND MEMORANDUM

### ORDER

**AND NOW**, this 26th day of July, 2007, upon consideration of defendant's Motion to

Suppress Physical Evidence (Document No. 42, filed May 25, 2007); the Government's Response

in Opposition to Defendant's Motion to Suppress Physical Evidence (Document No. 48, filed June

7, 2007); the Letter of Special Assistant United States Attorney Robert J. Daisey dated June 4,

2007 (Document No. 60, filed July 3, 2007); defendant's Memorandum of Law in [sic] Addressing

Defendant's Standing and Reasonable Expectation of Privacy to Contest Vehicle Stop and Search

(Document No. 61, filed July 3, 2007); following a hearing and oral argument on June 19, 2007,

and continued oral argument on July 13, 2007, for the reasons set forth in the attached

Memorandum, **IT IS ORDERED** that defendant's Motion to Suppress is **DENIED**.

### MEMORANDUM

## I.    INTRODUCTION

Defendant James H. Dennis, Jr. is charged in a one count Indictment with possession with

intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(B).  Presently before the Court is defendant's Motion to Suppress Physical Evidence.  The

Court held a hearing and oral argument on defendant's Motion to Suppress on June 19, 2007 and

further oral argument on July 13, 2007.  For the reasons set forth below, defendant's Motion to Suppress is denied.

## II.      BACKGROUND

### A.      Surveillance by Officer Fontan

At approximately 7:30 pm on May 22, 2006, Police Officer Roberto Fontan, assigned to the District Attorney's Office, received a telephone call from a confidential informant ("CI").  Tr. 6/19/07 at 28-29, 36.  Prior to the incident, Officer Fontan had worked with the CI on approximately three investigations, resulting in the confiscation of over 600 grams of heroin and 140 grams of crack cocaine and the arrest of four people.  Id. at 29-30.

On this occasion, the CI told Officer Fontan that a black male had arrived and parked a green Pontiac Grand Prix, license plate number GBB-2187, on the 3900 block of Reese Street in Philadelphia, Pennsylvania.  Id. at 30, 42-43.  According to the CI, the black male intended to purchase a kilogram of cocaine in a house at that location.  Id. at 39.  After receiving the information on the anticipated drug purchase, Officer Fontan drove to and parked on the 3900 block of Reese Street.  Id. at 30-31.  The vehicle identified by the CI was already parked on the block when Officer Fontan arrived.  Id. at 36.  Officer Fontan confirmed the make, model, color, and license plate number of the vehicle described by the CI.  Id. at 30-31.  He then contacted officers from the District Attorney's Office and members of the Drug Enforcement Administration (DEA) who came to the area.  Id. at 31.

Officer Fontan also contacted Police Officers Dennis Baker and Vincent Coughlin of the Highway Patrol Unit.  Id. at 32.  Officer Fontan told them that he " had received information that a black male was inside a property in the 3900 block of Reese Street for the purpose of purchasing a

2

kilo of cocaine at which that time he was, the black male was inside and the vehicle that the confidential informant had given me was parked outside on the 3900 block of Reese Street."  Id.

By radio, Officer Fontan gave Officers Baker and Coughlin the license plate number of the Grand Prix.  Id.  Officer Coughlin "ran" the license plate number and told Officer Fontan that the license plate was registered to a Ford, not a Pontiac.  Id. at 32, 52, 77.

Thereafter, Officer Fontan received another telephone call from the CI.  The CI said that the black male had purchased a kilo of cocaine from a third-party seller,[1] and was about to leave with the drugs.  Id. at 32, 38.  Officer Fontan testified that the CI did not know how much money was involved, but saw the transaction and the kilo of cocaine.  Id. at 33.  Officer Fontan further testified that the CI told him he observed the seller "counting the money" and the buyer "checking . . . he opened up the kilo of cocaine, checking if it was real good stuff.  It was real or probably was like baking soda or soap or something."  Id. at 40.

At approximately 8:00 pm, Officer Fontan saw a black male walking toward and entering the driver's door of the Grand Prix.  Id. at 32-33.  Officer Fontan then notified the back-up officers by radio that the vehicle was leaving the block.  Id. at 33.  Officer Fontan could not identify the person getting into the Grand Prix.  Id. at 41.

**B.      Back-Up by Officers Baker and Coughlin**

Officers Baker and Coughlin learned that they were to serve as back-up to the investigation of Officer Fontan in the evening of May 22, 2006.  Id. at 50, 74.  Officer Baker testified that he learned of the investigation "right after roll call," around 6:20-6:30 pm from his supervisor,

_____

[1]  Officer Fontan did not disclose the seller's name, because of an ongoing investigation. Id. at 39.

Sergeant O'Connor.  Id. at 56.  Officer Coughlin testified that he received the assignment at roll

call, around 6:00 pm, also from Sergeant O'Connor.  Id. at 74.

Officers Baker and Coughlin drove to a parking lot at Fifth and Luzerne Streets in

Philadelphia, "[i]n the area of" the 3900 block of Reese Street.  Id. at 50, 57-58, 74-75.  There,

they met officers from the District Attorney's Office and the DEA.  Id. at 58, 75.  Officer Coughlin

testified that he learned that the CI was in a house on Reese Street and that the CI told officers

from the District Attorney's Office that "there was going to be some kilos of cocaine bought that

night by different individuals."  Id. at 75.  The role of Officers Baker and Coughlin was to stop the

buyers and recover the narcotics.  Id. at 59, 76.

As part of the investigation, Officers Baker and Coughlin received a radio.  Id. at 58, 75.

Officer Baker's testimony as to what he heard on the radio conflicts with Officer Fontan's

testimony that he learned of buyer in the Grand Prix at 7:30 pm, after the vehicle was parked on

the 3900 block of Reese Street.  Specifically, Officer Baker testified that "we were waiting for a

Pontiac, if I may refer, a green Pontiac, Pennsylvania tag GBB-2187, to come onto the 3900 block

of Reese Street because that vehicle, the operator of that vehicle, was from the information that we

got from Officer Fontan, was purchasing a kilo of cocaine."  Id. at 50.  Officer Baker further

testified that he heard on the radio "[t]hat the vehicle arrived, it parked, a male got out and entered

a home, entered the house."  Id. at 60; see also id. at 51, 70.

C.     **Vehicle Stop and Search by Officers Baker and Coughlin**

From their position at Fifth and Luzerne Streets, Officers Baker and Coughlin heard on the

radio that the Pontiac was leaving the 3900 block of Reese Street.  Id. at 33, 51, 77.  Officers

Baker and Coughlin began following the car and stopped it on Roosevelt Boulevard.  Id. at 33, 51-

52, 77-78.

Officer Coughlin testified that as the Grand Prix was pulling over, but before the vehicle stopped, he saw "the male reach back with his hand behind the passenger seat, the rear of the passenger seat, front passenger seat."  Id. at 78, 81, 53.  Officer Coughlin told Officer Baker about the motion he observed.  Id. 53, 81.

After pulling the car over, Officer Baker testified that he asked the driver, Dennis,[2] for his license and registration, which Dennis did not produce.  Id. at 54.  Officer Baker then opened the car door and patted down Dennis' waistband.  Id. at 54, 64, 78.  He added that he "may have been opening the door at the same time but I asked him for his information."  Id. at 64.  At about the same time, Officer Coughlin walked over to the passenger side of the car.  He shined his flashlight behind the front passenger seat and observed "a couple inches" of "a white plastic bag sticking out from underneath the seat."  Id. at 78, 80.  Officer Coughlin told Officer Baker what he saw.  Id. at 78, 80.

Officer Baker then handcuffed Dennis' hands behind his back, and brought Dennis to the back of the Grand Prix.  Id. at 55, 65.  Officer Coughlin held Dennis there.  Id. at 55, 65, 78.  Officer Baker next shined his flashlight in the passenger side of the car.  Id. at 55.  He testified that he could see "the same object" described by Officer Coughlin "just about an inch out of the passenger seat on the back, on the bottom.  I opened up the passenger door."  Id. at 55.[3]  He further testified that the object that he saw "was a – it was a white, it was a white plastic bag like a

---

[2]  As defense counsel stated during oral argument on July 13, 2007, "[w]e have to agree that it's him [Dennis] that was in that vehicle that ultimately got stopped."  Tr. 7/13/07 at 35.

[3]  Officer Baker testified that Officer Coughlin "told me he observed a rectangular bag, bag in the shape of rectangular under the – right at the rear passenger seat at the back."  Id. at 54.  Officer Coughlin, however, did not testify to seeing a "rectangular bag."  See id. at 78, 80.

5

Wawa type bag wrapped tight.  And you could actually make out four corners of a rectangle-type

shape . . . ."  Id. at 55, 67.  In his experience as a police officer, Officer Baker has seen kilograms

of cocaine approximately fifteen to twenty times.  Id. at 49.

**D.      Defendant's Relationship to the Grand Prix**

The Grand Prix was a rental car.  Tr. 4/19/07 at 9, 84.  Alicia Green was the renter and an

authorized driver of the vehicle.  Id. at 9.  It appears that Dennis was not an authorized driver of

the car under the terms of the rental agreement, although the rental agreement was not produced by

the car rental company.  Id. at 12, 17, 21, 23.  Between 4:30 and 5:00 on May 22, 2006, Green

gave Dennis permission to use the car.  Id. at 16, 82-83.[4]  Dennis has known Green for

approximately twenty years.  Id. at 82.

Dennis testified that he was carrying his driver's license in his wallet at the time of the

stop, and that it was taken "into property" at the Curran-Fromhold Correctional Facility after his

arrest.  Id. at 84.  He further testified that he had paperwork for the Grand Prix in the glove

compartment.  Id. at 85.  According to Dennis, he did not show his driver's license or the

paperwork for the vehicle to the arresting officers because they did not ask for the documents.  Id.

at 84-85.

**III.    STANDARD OF REVIEW**

"On a motion to suppress, the government bears the burden of showing that each individual

act constituting a search or seizure under the Fourth Amendment was reasonable."  United States

v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); see also United States v. Coward, 296 F.3d 176, 180

(3d Cir. 2002).  The applicable burden is proof by a preponderance of the evidence.  United States

---

[4] Dennis did not testify as to whether the time was 4:30 to 5:00 am or 4:30 to 5:00 pm.

v. Matlock, 415 U.S. 164, 178 n.14 (1974).

**IV.   DISCUSSION**

In the instant Motion to Suppress, defendant raises three arguments.  First, defendant argues that the officers lacked reasonable suspicion for the stop of the Grand Prix.  Second, defendant argues that he was arrested without probable cause when he was removed from the Grand Prix, handcuffed and held by Office Coughlin at the back of the vehicle.  Third, defendant argues that there was no lawful basis for the search of the Grand Prix.[5]

In response, the government argues that defendant lacks standing under the Fourth Amendment to challenge the vehicle search.  In addition, the government responds to each of defendant's arguments.  First, the government argues that the stop was valid because the officers had reasonable suspicion to believe (1) that the Grand Prix had an illegal license plate and (2) that the driver was engaged in a drug transaction.  Second, the government argues that defendant was not arrested when he was handcuffed and held at the back of the Grand Prix.  Third, the government argues that the vehicle search was lawful because (1) the officers had probable cause to conclude the Grand Prix contained contraband; (2) the narcotics were in plain view; and (3) the officers had reasonable suspicion to search the passenger compartment for weapons under Terry v. Ohio, 392 U.S. 1 (1968).

The Court addresses each of the issues raised by defendant's Motion to Suppress in turn.

**A.     Dennis Has Standing to Challenge the Vehicle Search**

The Fourth Amendment protects "the right of the people to be secure in their persons,

---

[5]  In the Motion to Suppress, defendant does not challenge the frisk of his waistband.  Tr. 6/19/07 at 41-42 ("I'm not challenging that issue because no contraband was found as a result of the patdown.").

houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV.
An individual must have standing to assert a Fourth Amendment claim.  "Standing to challenge a
search requires that the individual challenging the search have a reasonable expectation of privacy
in the property searched and that he manifest a subjective expectation of privacy in the property
searched." United States v. Baker, 221 F.3d 438, 441 (3d Cir. 2000) (citing Rakas v. Illinois, 439
U.S. 128, 143 (1978)).  Fourth Amendment rights are personal rights and cannot be vicariously
asserted.  Id.

In Baker, the Court of Appeals for the Third Circuit held that "whether the driver of a car
has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a
fact-bound question dependent on the strength of his interest in the car and the nature of his
control over it; ownership is not necessary." Id. at 442.  Under this standard, the Baker court held
that the driver of a borrowed car had standing under the Fourth Amendment under the following,
somewhat analogous facts:

> Baker is asserting his own, not a third party's, expectation of privacy. He came alone
> in the car to the parole office. Although he did not own the car, he had substantial
> control over it insofar as he had borrowed it from a friend and had been driving it for
> four to six weeks. He carried the keys with him into the parole office.  Although the
> defendant and his associates were somewhat vague about who owned the car, there is
> no evidence in the record that the car was stolen or that [defendant] knowingly
> possessed a stolen car.
> . . .
> [T]here is clear evidence of continuing possession and control, as well as no evidence
> that the driver obtained the car illegitimately. Under the circumstances, therefore,
> Baker had the requisite legitimate expectation of privacy to support standing for Fourth
> Amendment purposes.

Baker, 221 F.3d at 443.

The Third Circuit has not yet addressed the question whether an unauthorized driver of a
rental car has standing to challenge a vehicle search under the Fourth Amendment.  However,

several other Circuit Courts have addressed the issue directly.  See United States v. Thomas, 447 F.3d 1191 (9th Cir. 2006) (collecting cases and analyzing the Circuit split).

Of the Circuits to address the issue, the Fourth, Fifth and Tenth Circuits have adopted a bright line approach, under which an unauthorized driver of a rental car lacks standing to object to its search.  See United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994); United States v. Boruff, 909 F.2d 111, 117 (5th Cir. 1990); United States v. Roper, 918 F.2d 885, 887-88 (10th Cir. 1990).  The Eighth and Ninth Circuits have adopted a modified bright-line approach, under which an unauthorized driver may have standing to challenge a vehicle search if he received permission from the authorized driver to use the car.  United States v. Thomas, 447 F.3d 1191, 1199 (9th Cir. 2006); United States v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998).  Finally, the Sixth Circuit has adopted a totality of the circumstances approach, in which courts consider factors including, (1) whether the defendant has a driver's license; (2) the relationship between the unauthorized driver and the lessee; (3) the driver's ability to present rental documents; (4) whether the driver had the lessee's permission to use the car; and (5) the driver's relationship with the rental company. United States v. Smith, 263 F.3d 571, 586 (6th Cir. 2000).

One court in this Circuit recently considered this standing issue in light of the Third Circuit's opinion in Baker.  In United States v. Kennedy, 2007 WL 1740747, *3-4 (E.D. Pa. Jun. 15, 2007), the court observed that in Baker, the Third Circuit adopted a "fact-bound" inquiry into a driver's standing.  Id. at *4.  Accordingly, the Kennedy court held that Baker "may be read as an implicit endorsement of either the modified bright-line rule or the totality of the circumstances test."  Id.  As to the bright-line approach, the court observed: "Despite the laudable qualities of this standard–including ease of applicability–it is a blunt instrument, particularly in an area of law that

usually calls for a fact-specific analysis." Id. at *3.

This Court agrees with the analysis of the Kennedy court.  In Kennedy, citing Baker, the Court predicted that "the Third Circuit would utilize either the modified bright-line rule, under which unauthorized drivers of rental cars have standing to contest a search if they have the permission of an authorized driver, or the totality of the circumstances test." Id. at *4.

In this case, either of these two approaches–the modified bright line rule or the totality of the circumstances test–leads to the conclusion that Dennis has standing to contest the search of the Grand Prix.  Dennis had the authorized driver's permission to use the Grand Prix;  he knew the renter and authorized driver, Green, for approximately twenty years; he was alone in the vehicle; he had the keys; and he had been using the car for several hours before the search.  Tr. 4/19/07 at 82-83.  In addition, there is some evidence that defendant had his driver's license and paperwork for the vehicle with him at the time of the search.  Id. at 84-85.

Thus, the Court concludes that Dennis has standing to object to the vehicle search.[6]

**B.      The Stop of Dennis Was Reasonable**

**1.      The Stop of Dennis Was Reasonable as a Traffic Stop**

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996).  Under Whren, the subjective intent of the officer plays no role in the probable cause analysis.  Id. at 813, 819.  As the Second Circuit has explained, "an observed traffic

---

[6] There is no question that Dennis has standing to object to the *stop*.  See Brendlin v. California, 127 S.Ct. 2400 (2007) (holding that when a police officer makes a traffic stop the driver and passengers are seized and may challenge the constitutionality of the stop); United States v. Mosley, 454 F.3d 249, 253 (3d Cir. 2006) (same).

violation legitimates a stop even if the detectives do not rely on the traffic violation."  United States v. Dhinsa, 171 F.3d 721, 725 (2d Cir. 1999).

In this case, the arresting officers had probable cause to stop defendant because they "ran" the license plate on the Grand Prix and learned that it was registered to a Ford.  See, e.g., United States v. Ayers, 2003 WL 292086, *4-5 (D. Del. Feb. 6, 2003) (upholding traffic stop based on an illegal license plate where officers had information regarding drug trafficking from a confidential informant).  Indeed, defense counsel conceded this point during oral argument on June 19, 2007. Tr. 6/19/07 at 96 ("I agree that they had reasonable suspicion to stop the vehicle, although I've pled otherwise in my motion, because when you have the difference between the license plates, it gives them a reasonable suspicion independently, a reasonable basis independently to stop the vehicle.  I don't have an issue with that.").

Thus, the Court concludes that the stop of the Grand Prix was reasonable.

**2.      The Stop of Dennis Was Reasonable as a Terry Stop**

In the alternative, the Court concludes that the officers had reasonable suspicion to believe that Dennis was engaged in criminal activity.  Thus, the stop was reasonable under Terry.

As a general matter, reasonable searches and seizures must be based upon probable cause and executed pursuant to a warrant.  See, e.g., Katz v. United States, 389 U.S. 347, 357 (1967). However, under Terry, a police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000).  "Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting that particular person stopped of criminal activity.'"  United States v. Brown, 448 F.3d 239, 246

(3d Cir. 2006) (quoting <u>United States v. Cortez</u>, 449 U.S. 411 (1981)).  "At the same time, we

must allow 'officers to draw on their own experience and specialized training to make inferences

from and deductions about the cumulative information available to them that might well elude an

untrained person.'"  <u>Id.</u> (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002)).

      In evaluating whether reasonable suspicion exists, the Court considers the totality of the

circumstances.  <u>Id.</u> at 246-47 (citing <u>Cortez</u>, 449 U.S. at 417).  Where a <u>Terry</u> stop is based upon

information provided by an informant, "the court considers both the reliability of the tip or

informant and the content of the tip."  <u>United States v. Goodrich</u>, 450 F.3d 552, 560 (3d Cir.

2006); <u>see also</u> <u>Alabama v. White</u>, 496 U.S. 325, 328 (1990) ("An informant's "'veracity,'

'reliability,' and 'basis of knowledge'-remain 'highly relevant in determining the value of his

report.'").  However, "reasonable suspicion can be established with information that is different in

quantity or content than that required to establish probable cause" and "can arise from information

that is less reliable than that required to show probable cause."  <u>White</u>, 496 U.S. at 330.

      Where a <u>Terry</u> stop is based upon a radio bulletin, "[a] finding of reasonable suspicion to

justify [a] stop require[s] the presentation of evidence by the government that the officer who

issued the radio bulletin had reasonable suspicion, not simply that it was reasonable for the

arresting officer to have relied on the bulletin."  <u>Coward</u>, 296 F.3d at 180 (citing <u>United States v.</u>

<u>Hensley</u>, 469 U.S. 221 (1985)).

      In this case, Officer Fontan learned from the CI that a black male had arrived on the 3900

block of Reese Street in a green Pontiac Grand Prix, license plate number GBB-2187, for the

purpose of purchasing a kilogram of cocaine.  Tr. 6/19/07 at 30, 42-43.  Officer Fontan confirmed

that the vehicle was parked on the block.  <u>Id.</u> at 30-31.  Thereafter, the CI told Officer Fontan that

12

he witnessed the drug transaction and that the buyer, a black male, was about to leave with the kilo of cocaine.  Id. at 32, 38.  After that telephone call, Officer Fontan confirmed that a black male walked towards and entered the Grand Prix.  Id. at 32-33.  Officer Fontan communicated this information to Officers Baker and Coughlin.  Id. at 32-33, 51-52, 77.  Officer Fontan knew the identity of the CI and had worked with the CI on approximately three prior investigations.

The information communicated by the CI to Officer Fontan and by him to Officers Baker and Coughlin was sufficient to establish reasonable suspicion that defendant was engaged in a drug transaction.  Thus, the Court concludes that the stop of defendant was reasonable under Terry.

## C.   The Stop of Dennis Did Not Rise to the Level of a *De Facto* Arrest

There is no bright line rule for determining when an investigatory stop becomes a *de facto* arrest.  United States v. Sharpe, 470 U.S. 675, 685 (1985).  Under Terry, courts "examine 'whether the officer's action . . . was reasonably related in scope to the circumstances which justified the interference in the first place.'"  Id. at 682 (quoting Terry, 392 U.S. at 20).

"[W]hen police officers make an investigative stop, they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"  United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995) (quoting Hensley, 469 U.S. at 235).  "[T]here is no per se rule" that handcuffing a suspect elevates a stop into a seizure under the Fourth Amendment.  Baker v. Monroe Tp., 50 F.3d at 1193; see also United States v. Prince, 157 F. Supp. 2d 316, 325 (D. Del. 2001).  In evaluating the use of handcuffs, a court must "look at the intrusiveness of all aspects of the incident in the aggregate."  Baker, 50 F.3d at 1193.

In this case, the Court concludes that Officers Baker and Coughlin were justified in

handcuffing Dennis while they conducted a vehicle search.  The officers suspected Dennis of drug trafficking, a crime often associated with violence.  United States v. Burton, 193 F.R.D. 232 (E.D. Pa. Feb. 25, 2000), aff'd on other grounds 288 F.3d 91 (3d Cir. 2002).  Officer Coughlin saw Dennis reach behind the front passenger seat as Dennis was pulling over.  That could have led a reasonable police officer to suspect that Dennis was armed.  In addition, the stop took place at night, and on a highway.  For all of these reasons, placing Dennis in handcuffs during the vehicle search was justified for officer safety.  Edwards, 53 F.3d at 619.

Nor is there evidence that the investigative measures adopted were more intrusive than necessary.  See Florida v. Royer, 460 U.S. 491, 501 (1983).  In particular, there is no evidence that the stop was unreasonably long.  Sharpe, 470 U.S. at 688.  Dennis was not placed in a police car. There is no evidence that the officers drew their guns.  Cf. Ayers, 2003 WL 292086 at *5 (holding that "although not the basis for the stop, the approach of [sic] the Mercedes with guns drawn is not unreasonable considering the officers' knowledge that the car was used by a suspected drug dealer").

Thus, under all of the circumstances, the Court concludes that the investigative stop did not rise to the level of a *de facto* arrest under the Fourth Amendment.

**D.     The Validity of the Vehicle Search**

Generally, warrantless searches are *per se* unreasonable under the Fourth Amendment. United States v. Williams, 413 F.3d 347, 351 (3d Cir. 2005).  However, "the 'ready mobility' of automobiles permits their search based only on probable cause" to believe the vehicle contains contraband.  Burton, 288 F.3d at 100-01; Ross v. United States, 456 U.S. 798, 804-09 (1982).

To determine whether information from a confidential informant is sufficient to establish

14

probable cause, courts consider the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213 (1983). Specifically, courts must determine "whether, given all the circumstances . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238. In applying the totality of the circumstances analysis, courts "recognize[] the value of corroboration of details of an informant's tip by independent police work." Gates, 462 U.S. at 241; United States v. Brown, 448 F.3d 239, 251 (3d Cir. 2006).

Where the officer conducting a vehicle search relies on a radio bulletin to establish probable cause, the government must present evidence that the officer who *issued* the radio bulletin had probable cause to conclude that the vehicle contained contraband. See United States v. Hensely, 469 U.S. 221, 231 (1985); Coward, 296 F.3d at 180. See also Burton, 288 F.3d at 99 ("[A]n officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis.'") (quoting Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997)).

In this case, Officer Fontan learned from the CI that a black male had arrived on the 3900 block of Reese Street in a green Pontiac Grand Prix, license plate number GBB-2187 for the purpose of purchasing a kilogram of cocaine. Tr. 6/19/07 at 30, 42-43. Officer Fontan confirmed that the vehicle was parked on the block. Id. at 30-31. Thereafter, the CI told Officer Fontan that he witnessed the drug transaction and that the buyer, a black male, was about to leave with the kilo of cocaine. Id. at 32, 38. After that telephone call, Officer Fontan confirmed that a black male walked towards and entered the Grand Prix. Id. at 32-33. Officer Fontan communicated this information by radio to Officers Baker and Coughlin. Id. at 32-33, 51-52, 77.

The information provided by the CI had "veracity" because Officer Fontan knew the

identity of the CI and had worked with the CI on approximately three investigations, resulting in

the confiscation of heroin and crack cocaine and the arrest of four people.  See Brown, 448 F.3d at

249 (holding that a known informant's tip is more reliable than an anonymous tip because "[t]he

person providing the tip can be 'held responsible if her allegations turn out to be fabricated'")

(citation omitted).  Officer Fontan corroborated the CI's statement that the Grand Prix was parked

on the 3900 block of Reese Street.  In addition, Officer Fontan corroborated the CI's statement that

the buyer was about to exit onto the street when he observed a black male enter the Grand Prix.

       The CI had a reliable "basis of knowledge" because the CI witnessed the drug transaction.

The CI knew the identity of the seller, saw the seller "counting the money," and saw the buyer

"checking" the quality of the cocaine.  See Brown, 448 F.3d at 249-50 (holding that informant's

tip is more reliable where "[t]he person providing the information has recently witnessed the

alleged criminal activity"); United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (holding

that informant had a reasonable basis for his beliefs where "informant was reporting what he had

observed moments ago, not what he learned from stale or second-hand sources").

       The observations of Officers Baker and Coughlin support a finding of probable cause to

search the Grand Prix in two respects.  First, Officer Coughlin observed "the male reach back with

his hand behind the passenger seat, the rear of the passenger seat, front passenger seat" as the

Grand Prix was pulling over.  Id. at 78, 81, 53.  Second, both Officer Baker and Officer Coughlin

shined their flashlights through the window of the Grand Prix and observed a package under the

front passenger seat.  Officer Coughlin testified that he saw "a couple inches" of "a white plastic

bag sticking out from underneath the seat."  Id. at 78, 80.  Officer Baker testified that he could see

"the same object" described by Officer Coughlin "just about an inch out of the passenger seat on

the back, on the bottom."  Id. at 55.  The Court "view[s] these facts through the lens of [the

officer's] significant experience with similar transactions." Burton, 288 F.3d at 99.  As such, these observations corroborate the information from the CI that there was cocaine in the Grand Prix.

As stated above, there is some inconsistency between the testimony of Officer Fontan and Officer Baker regarding the mechanics of the investigation.  Specifically, Officer Fontan testified that the CI called him at 7:30 pm and identified the Grand Prix *after* it was parked on the 3900 block of Reese Street.  Officer Baker testified that he was "waiting for a Pontiac . . .  to come onto the 3900 block of Reese Street" and that he heard over the radio "[t]hat the vehicle arrived, it parked, a male got out and entered a home, entered the house." Id. at 50, 60.  Under all of the evidence, the Court concludes that this inconsistency is not fatal to the determination of probable cause.  See United States v. Cook, 2005 WL 1484592, *6-7 (E.D. Pa. Jun. 22, 2005) (holding that inconsistencies in testimony of one officer were not material for purpose of motion to suppress).

Under the "totality of the circumstances" the Court concludes that the search of the Grand Prix was lawful because the police had probable cause to conclude that the vehicle contained contraband.  Gates, 462 U.S. at 238.  The Court does not reach the government's alternative arguments–that the narcotics were in plan view, Horton v. California, 496 U.S. 128 (1990), and that the officers had reasonable suspicion to search the passenger compartment of the Grand Prix for weapons under Terry and Michigan v. Long, 463 U.S. 1032, 1049 (1983).

## V.     CONCLUSION

For the foregoing reasons, the Court denies defendant James H. Dennis, Jr.'s Motion to Suppress Physical Evidence.

BY THE COURT:


/s/ Honorable Jan E. DuBois
        JAN E. DUBOIS, J.